Jackie Dean HENDRICKS,
Petitioner–Appellant,

v.

Carl ZENON, Superintendent, Oregon
State Correctional Institute,
Respondent–Appellee.

No. 92–35289.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted January 7, 1993.

Decided April 22, 1993.

As Amended July 8, 1993.

George G. Curtis, Portland, OR, for petitioner-appellant.

Katherine H. Waldo, Asst. Atty. Gen., Salem, OR, for respondent-appellee.

Before: D.W. NELSON, TROTT, and T.G. NELSON, Circuit Judges.

TROTT, Circuit Judge:

Jackie Dean Hendricks ("Hendricks") appeals the denial of his habeas corpus petition under 28 U.S.C. § 2254 (1988) on several grounds. Hendricks claims: 1) he was denied his Sixth Amendment right to the effective assistance of counsel on appeal; 2) he was deprived of due process of law because the prosecution withheld exculpatory evidence; 3) he was denied due process of law because the State failed to provide funding for investigative expenses in a timely manner; 4) he was denied due process of law because the trial court failed to merge all of his convictions for sentencing; 5) he was denied due process of law because the prosecution knowingly used perjured testimony; 6) he was denied due process of law because the trial court admitted a tape recording of his statement; and 7) he was denied due process of law because the trial court sentenced him under the dangerous offender statute. The district court denied relief. The district court had jurisdiction pursuant to 28 U.S.C. § 2254. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. Because the Oregon Court of Appeals' decision to deny Hendricks substitution of counsel and to require him to pursue his appeal pro se was in violation of his Constitutionally guaranteed right to effective assistance of counsel, we reverse and remand to the district court to issue the writ and determine a reasonable time in which the State of Oregon shall grant Hendricks a new appeal with respect to matters involving

state law and any remaining matters of federal Constitutional law not decided by this Opinion. Hendricks shall have the benefit of counsel during this appeal unless he knowingly and intelligently waives this right and unequivocally requests to proceed pro se.

I

At trial, Kristi Oreb testified that on Tuesday, June 25, 1985, at approximately 9 p.m., her boyfriend's brother, Hendricks, came to the Creswell, Oregon apartment Oreb shared with Hendricks's ex-girlfriend, Karen Hunter. Hendricks agreed to give Oreb a ride to a friend's house in Springfield, Oregon to look for an individual named Guy Bennett. When Hendricks and Oreb arrived at the Springfield house, Bennett was not there. They went to another house in Springfield to look for him. Failing to locate him, they drove south on the freeway back toward Creswell.

When they arrived at the Creswell exit, Hendricks suggested they go on to Cottage Grove to a party where Bennett might be. Oreb testified Hendricks took another exit and drove to "the middle of nowhere," driving up "a bunch of back roads." In this location, 13 miles from the nearest residence, Hendricks stopped the car, pulled out a knife, and cut Oreb's neck. After cutting Oreb's neck, he apologized and explained he did not know what he was doing or why he was doing it. Hendricks then struggled with Oreb and raped her. After raping her, he again apologized and asked Oreb not to tell anyone about the rape. This was Oreb's last recollection of the incident before she woke up in the woods two days later.

Physical evidence from the scene and the physical injuries to Oreb indicated that after raping her, Hendricks hit Oreb in the head with a tire iron, stabbed her, tied a rope around her, dragged her 70 feet and threw her down a ravine.[1]

Oreb was found the afternoon of Thursday, June 27, 1985 by loggers in the woods. Oreb was dirty and wearing bloodstained clothing. Oreb told the loggers Hendricks was responsible for her condition. The loggers called for an ambulance and police.

When Trooper Cantu of the Oregon State Police arrived, he spoke with Oreb. Oreb told him Hendricks had stabbed her. She told Cantu where Hendricks lived in Florence, Oregon and described the car he was driving.

At approximately 9 p.m. on Thursday, June 27, 1985, Trooper Tindle called Hendricks at Hendricks's home in Florence and asked him to meet him at the Florence patrol office at 9:30. Hendricks agreed to come to the patrol office but failed to appear. When police went to his home, they found the car Oreb had described.

The car, a Datsun, belonged to Hendricks's current girlfriend, Davis, who testified Hendricks had been in possession of the car during the time period described by Oreb. The police found blood spatters and a tire iron with blood on it in the car. The wheel base of the car was measured, and it matched the tire tracks found at the scene of the assault.

---

1. Dr. Jerome Kasher, the surgeon who treated Oreb in the emergency room on June 27, 1986, testified he found "significant lacerations on the back of her head" which were "deep enough to go all the way down to the skull." He testified she had "abrasions and contusions around her neck, especially and over her shoulders and there was a wound that appeared ... to be a stab wound in the middle of her back." He further testified there was a "shallow cut on the front of her neck that had the appearance of most likely being a knife wound."

   Dr. Kasher testified it was his opinion that a rope could have caused the lacerations on the victim's neck and a tire iron could have caused the injuries to her head. He also testified he was not a forensic pathologist and he was giving his opinion based on his experience in the emergency room. Spermatozoa was present in the victim's vagina.

   A pathologist, Dr. Edward Wilson, testified he would "consider the strong possibility that [the wounds on the back of the victims head were] due to a [sic] object like a tire iron, a round or cylindrical object that could have struck the scalp and produced this sharp wound." He commented on the abrasions around the victim's neck and testified they were "consistent with some type of ligature and rope."

   Police officer Carr testified to "drag marks" and "blood marks" next to "tire marks" found at the scene. He testified that he found a "drag mark" which was 59 feet in length and that there was a "blood spot at the bottom of the embankment and right next to that area was the rope." He testified that he believed the "victim tumbled down the embankment."

Hendricks finally was arrested on Friday, when he was found hiding in a closet at a friend's house. He was transported from Florence to Eugene by police. He gave a taped statement en route in which he told police he had loaned the Datsun to a person named "John" in Oakridge on the night of June 25, 1985. At trial, when confronted with his statement to police about "John," Hendricks testified, "I—that part, I think I did make up. I don't remember." He also testified, "I don't remember if I loaned my car out or not." At trial, Hendricks admitted he had lied to his girlfriend and to police about different aspects of his story, but maintained that during the time of the alleged assault he was at the home of a friend, Peter Olin.

## II

■■■ We review de novo the district court's decision to deny a petition for habeas corpus. *Adams v. Peterson,* 968 F.2d 835, 843 (9th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993); *Thomas v. Brewer,* 923 F.2d 1361, 1364 (9th Cir.1991). However, "[t]o the extent it is necessary to review findings of fact, the clearly erroneous standard applies." *Thomas,* 923 F.2d at 1364. In reviewing a district court's grant or denial of a habeas corpus petition, state court factual conclusions are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir. 1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992); *Hamilton v. Vasquez,* 882 F.2d 1469, 1470–71 (9th Cir.1989).

## III

Hendricks argues he was denied his Sixth Amendment right to counsel when the state appeals court refused to substitute appointed counsel, requiring him to proceed pro se in his direct appeal. Hendricks had been having difficulties with his appointed counsel and, on October 5, 1987, he asked the court to remove her and to appoint new counsel. In this motion—which is best viewed as a motion to substitute counsel—he complained that his counsel refused to raise issues which he felt were ripe for appeal, refused to attach affidavits from his trial attorney and investigator to the appellate brief, and did not have his best interests in mind.

During this period, the public defender also indicated her dissatisfaction with the situation. On October 14, 1987, she moved to withdraw as counsel and to withdraw the appellate brief she had filed on Hendricks's behalf. The Oregon Court of Appeals granted this motion on October 21, but did not appoint new counsel, leaving Hendricks to pursue his direct appeal unrepresented. In a letter dated October 2, 1987, the public defender had warned Hendricks about the possibility of this outcome: "Please be advised that the court may not allow you another attorney and may require that you proceed by yourself."

On October 26, proceeding pro se, Hendricks filed a motion for an extension of time to file an appellate brief. On November 4, the state appeals court granted this motion and formally denied Hendricks's motion for appointment of new appellate counsel. There is no indication in the record that the court ever held a hearing regarding Hendricks's motion to substitute counsel. On November 9, 1987, Hendricks filed what he styled a "petition for reconsideration" on his substitution of counsel motion. In an order denying the motion, again without a hearing, the court said the following: "The Court [sic] is not persuaded that the Public Defender failed to provide effective assistance of counsel to appellant; therefore, the 'petition for reconsideration' is denied."

Hendricks eventually filed a pro se brief. His conviction was affirmed without opinion. *State v. Hendricks,* 92 Or.App. 96, 757 P.2d 877, *rev. den.,* 306 Or. 528, 761 P.2d 929 (1988).

Basing its decision on *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the district court denied Hendricks's petition for a writ of habeas corpus and held Hendricks had waived his right to counsel. Noting Hendricks's counsel had warned him that his motion for appointment of new counsel might be denied, the district court held that "petitioner could not be heard to complain that he was 'forced' to proceed pro se." In so holding, the district court was in error.

■ A State has a duty to provide ·an indigent defendant with effective assistance of counsel through his first appeal. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). This duty is commanded by the Fourteenth Amendment to the Constitution of the United States. *Id.* at 358. As the Court later said,

> In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that—like a trial—is governed by intricate rules that to a layperson would be hopelessly forbidding. An unrepresented appellant—like an unrepresented defendant at trial—is unable to protect the trial interests at stake.... A first right of appeal therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.

*Evitts v. Lucey,* 469 U.S. 387, 396 (1985). *See also Penson v. Ohio,* 488 U.S. 75, 85 (1988) ("The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage.")

In the alternative, a defendant has a Constitutional right under the Sixth Amendment to proceed pro se. *Faretta,* 422 U.S. at 832, 95 S.Ct. at 2539 (1975). It is well established in the Ninth Circuit, however, that in order to invoke the Sixth Amendment right to self-representation, the request must be: (1) knowing and intelligent, and (2) unequivocal. *See Jackson v. Ylst,* 921 F.2d 882, 888 (9th Cir.1990); *Adams v. Carroll,* 875 F.2d 1441, 1442 (9th Cir.1989); *United States v. Smith,* 780 F.2d 810, 811 (9th Cir.1986); *Armant v. Marquez,* 772 F.2d 552, 555 (9th Cir.1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 902 (1986).

■ The first problem we encounter with this case is that Hendricks never requested to proceed pro se. He was forced into this posture when his request for substitute counsel was denied and the public defender withdrew her brief. It is impossible to construe Hendricks's behavior as a request to proceed without counsel, much less an unequivocal request for self-representation.

In *Adams,* we held a request to proceed without counsel was unequivocal, even though petitioner at his trial consistently wished to invoke the right only as an alternative to the appointment of a particular defense attorney. *Adams,* 875 F.2d at 1445. Unlike the instant case, however, it was clear petitioner in *Adams* was aware he would be required to proceed pro se if he did not elect to use the particular attorney to which he objected. *Id.* at 1442 (Defendant stated "If I can't have another lawyer, I will have to go pro per."). Moreover, in *Adams,* we found "the trial court engaged [Adams] in extensive discussion regarding the difficulties of proceeding pro per." *Id.* at 1445. Thus, the facts which·led the *Adams* court to determine the petitioner's. request to ·represent himself was unequivocal are absent from the present case. *See Stano v. Dugger,* 921 F.2d 1125, 1148 (11th Cir.) (en banc), *cert. denied,* — U.S. ——, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991) ("Because the right to counsel is so precious to our jurisprudence, the waiver of this right must be asserted.").

In the instant case, the record conclusively rebuts the .contention that Hendricks ever requested to represent himself. The State relies on the fact that Hendricks moved for the removal of his counsel as indicia of a request to proceed pro se. The motion for removal of counsel was made in conjunction with a motion for appointment of new counsel. At no time did the defendant ever express a desire to proceed pro se. He merely moved for substitution of counsel. The State's argument is manifestly wrong. Thus, we conclude Hendricks did not make an unequivocal request to proceed pro se.

Furthermore, even assuming for argument's sake that Hendricks's motions could be construed as a request to proceed pro se, there is absolutely no showing such a request was "knowing and intelligent." *Farretta,* 422 U.S. at 835, 95 S.Ct. at 2541. Federal cases on this issue are instructive. In *United States v. Balough,* 820 F.2d 1485 (9th Cir. 1987), we held:

> [A] district court should not grant a defendant's request to waive representation of counsel and serve as his own counsel, without discussing with the defendant, in open .court, whether the waiver was knowingly

and intelligently made, with an understanding of the charges, the possible penalties, and the dangers of self-representation. This is clearly the preferable procedure and should be followed by district courts in every case.

*Balough,* 820 F.2d at 1488 (quoting *United States v. Harris,* 683 F.2d 322, 324 (9th Cir.1982)); *see also United States v. Robinson,* 913 F.2d 712, 714–15 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1006, 112 L.Ed.2d 1089 (1991); *United States v. Wadsworth,* 830 F.2d 1500, 1504–05 (9th Cir.1987); *United States v. Rylander,* 714 F.2d 996, 1005 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). In *Balough,* we held further that in certain rare cases "failure to discuss each of the elements in open court will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver." *Balough,* 820 F.2d at 1488. We emphasized, however, that we would rarely find a knowing and intelligent waiver absent specific inquiry into the elements unless the case involved "an unusual fact situation in which the background and experience of the defendant in legal matters was apparent from the record." *Id.* (quoting *Harris,* 683 F.2d at 324).

■ As evidence of a knowing and intelligent waiver, the state points to—and the district court relied upon—the fact that Hendricks's counsel had warned him that the court might not appoint new counsel for him. Simply warning a defendant that he may be required to proceed without counsel, however, is insufficient. The law requires a stronger warning about the dangers of self-representation and, indeed, a warning from the court, not counsel. *McMahon v. Fulcomer,* 821 F.2d 934, 944 (3d Cir.1987); *Patterson v. Illinois,* 487 U.S. 285, 298, 108 S.Ct. 2389, 2398, 101 L.Ed.2d 261 (1988) ("At the other extreme [from post-indictment photographic identification], recognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed before

permitting him to waive his right to counsel at trial."). For a waiver to be made "knowingly and intelligently," the petitioner must be aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation. *Balough,* 820 F.2d at 1487. The court must specifically discuss these three elements with the defendant. *Id.* at 1488. Absent this discussion, we will look to "'the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused' to determine whether the waiver was knowing and intelligent despite the absence of a specific inquiry on the record." *Id.* at 1488 (quoting *United States v. Kimmel,* 672 F.2d 720, 722 (9th Cir.1982) (quoting *Cooley v. United States,* 501 F.2d 1249, 1252 (9th Cir.1974), *cert. denied,* 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975))).

■ In the present case, there is no indication from the record that Hendricks was apprised of the dangers and disadvantages of self-representation. Moreover, the State does not contend Hendricks's background, prior experience, or conduct demonstrate he made a knowing and intelligent waiver of counsel. Nothing in the record reveals "an unusual fact situation in which the background and experience of the defendant in legal matters [is] apparent...." *Balough,* 820 F.2d at 1488 (quoting *Harris,* 683 F.2d at 324). We therefore hold Hendricks did not knowingly and intelligently waive his right to counsel.

Moreover, to the extent this episode arose out of the Oregon Court of Appeals denial of Hendricks's motion for substitution of counsel, that court erred in its handling of this issue.

■ Stripped to its essential core, the conclusion of the Oregon Court of Appeals is that a motion to substitute counsel because of an alleged conflict can amount to a forfeiture of the right to appointed counsel on direct appeal, even when thorough consideration is not given to the allegation. This view is untenable. There is nothing in the record to justify such a holding. Hendricks's motion for substitution of counsel was timely. Noth-

ing suggests his motion to substitute counsel was made as "a ploy to gain time or effect delay." *United States v. Kelm,* 827 F.2d 1319, 1322 (9th Cir.1987). This simply is not one of those cases where a court may "force a defendant to proceed pro se if his conduct is 'dilatory and hinders the efficient administration of justice.'" *United States v. Meeks,* 987 F.2d 575, 579 (9th Cir.1993) (quoting *Kelm,* 827 F.2d at 1322 (quoting *United States v. Leavitt,* 608 F.2d 1290, 1293 (9th Cir.1979))).

■ The Oregon Court of Appeals' denial solely on the basis of written motions indicates its decision was based purely on the fact that "[t]he Court [sic] is not persuaded that the Public Defender failed to provide effective assistance of counsel to appellant." The right to effective counsel on appeal as established in *Evitts* requires, however, that any inquiry into the reason the defendant is seeking substitution of counsel also requires an inquiry into the nature and extent of the conflict. *Walker,* 915 F.2d at 483. Thus, it is not enough to deny a request for substitution of counsel on the basis of the competency of present counsel, the court must also inquire about the nature and extent of the conflict between the defendant and counsel. In the instant case, there was no such inquiry. We conclude, therefore, the Oregon Court of Appeals' inquiry was inadequate. *See United States v. Torres–Rodriguez,* 930 F.2d 1375, 1381 (9th Cir.1991) (where trial court made absolutely no inquiry into the defendant's request for substitution, trial court abused its discretion in denying Torres's request for substitution of counsel); *Jackson,* 921 F.2d at 888 (trial judge is required to order a substitution of counsel if, after a hearing, it is demonstrated there is a breakdown in the attorney-client relationship); *Walker,* 915 F.2d at 483 (inquiry into

defendant's complaint was inadequate where court engaged defendant in a colloquy which revealed that the court focused on the competence of Walker's counsel without inquiring about the nature and extent of the conflict between defendant and counsel); *United States v. Mills,* 597 F.2d 693, 700 (9th Cir. 1979) (trial court's hearing on the conflict between attorney and defendant held to be an adequate inquiry).

■ The Oregon Court of Appeals was correct in concluding Hendricks is not necessarily entitled to the appointed counsel of his choosing. *Torres–Rodriguez,* 930 F.2d at 1380 n. 2 ("A defendant who seeks to replace one appointed counsel with another ... will need to justify the replacement.... An indigent defendant is entitled to appointed counsel, but not necessarily to appointed counsel of his choice.") However, the court failed to apprise Hendricks of the dangers and disadvantages of self-representation. His request for substitution of counsel was timely and not made for purposes of delay. If the Court of Appeals was going to deny his motion for substitution, it was compelled to keep the public defender in place to represent him, not forfeit his right to counsel. Clearly established precedent dictates our conclusion that the court's failure to provide him with representation resulted in the denial of due process.[2] We therefore reverse and remand to the district court to issue the writ and determine a reasonable time in which the State of Oregon shall grant Hendricks a new appeal with the benefit of appointed counsel unless he knowingly and intelligently elects, as required by law, to proceed pro se.[3]

### IV

28 U.S.C. § 2254(b) (1988) states:
[a]n application for a writ of habeas corpus in behalf of a person in custody pursuant

2. Because this case comes to us by way of habeas corpus, we decline to establish any specific procedures that must be followed by a state when an indigent criminal appellant tries either to waive his right to counsel or to secure the substitution of counsel because of conflicts. We are confident that state appellate courts will easily determine methods to cope with this problem that will satisfy the substantive commands of the Sixth Amendment as interpreted by the Supreme Court. Many choices are available, including limited remand to the trial court from which the matter came with instructions to the trial court as to how to proceed.

3. Hendricks also argues he was denied effective assistance of counsel because: 1) appellate counsel failed to adequately and personally communicate with Hendricks prior to or after filing the appellate brief; and 2) appellate counsel failed to raise certain issues in the appellate brief. These complaints are subsumed by our holding that Hendricks did not make a knowing and intelligent waiver of his right to counsel and that the Oregon Court of Appeals abused its discretion by failing to inquire into the nature and extent of the conflict between Hendricks and his counsel.

to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

By ordering a new appeal for Hendricks in the State court, we now find ourselves in the position of having "unexhausted" the remainder of his Constitutional claims. Ordinarily, he would have the opportunity again to raise his federal Constitutional claims in the new State appeal to which he is now entitled. Thus, we could refuse to hear those issues at this point and wipe the appellate slate clean. This we decline to do.

■ The requirement of "exhaustion of remedies" is not jurisdictional. It is essentially a matter of federalism and comity, *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), and we have the discretion to dispense with the rule "in rare cases where exceptional circumstances of peculiar urgency are shown to exist." *Id.* at 134, 107 S.Ct. at 1675 (quoting *Ex parte Hawk*, 321 U.S. 114, 117, 64 S.Ct. 448, 450, 88 L.Ed. 572 (1944)).

Here, the State has had the first opportunity to examine Hendricks's federal Constitutional issues as contemplated by § 2254(b). Thus, the interests of comity and federalism have been served. Moreover, were we to give the State a second bite at the apple, no doubt we would see Hendricks's federal Constitutional claims again years hence in a second petition should he lose on his appeal.

■ Although such a second petition could not under these circumstances be construed as an abuse of the writ, no doubt the process we envision would unnecessarily exhaust the petitioner and the resources of the court in the pursuit of form without substance. Accordingly, we believe it to be in the interests of justice to exercise our authority and to decide these issues now rather than later. Because the State's failure to afford counsel to Hendricks on appeal is the cause of the situation, it could not be heard to object to this procedure. *See Hill v. Reynolds*, 942 F.2d 1494 (10th Cir.1991) (where delay in appeal was caused by the State, petitioner was excused from exhaustion requirement); *Coe v. Thurman,* 922 F.2d 528 (9th Cir.1990) (same). This is indeed a rare case of peculiar urgency. Hendricks has a right to the prompt disposition of his claims concerning violation of his federal Constitutional rights. He should not be kept on a treadmill. Hendricks has petitioned us to hear these claims. We accede to his request. Because we hear these claims, however, the law-of-the-case doctrine will foreclose any opportunity Hendricks might have in state court to reprove them on federal Constitutional grounds.

## V

Hendricks claims he was deprived of due process of law because the prosecution withheld exculpatory evidence until after his trial. Prior to trial, David Smith notified the police that he had seen Kristi Oreb, the victim, at her home on Wednesday, June 26, 1985, the day after she was allegedly assaulted, and the day before she was found in the woods south of Cottage Grove. If true, David Smith's statements that he had seen the victim at her home the day after the alleged rape· and the day before she was found by the loggers would directly contradict the victim's testimony and other physical evidence produced at trial. Thus, the statements on their face are exculpatory.

Trooper Carr investigated the witness's statements early in the investigation, however, and determined they were inaccurate. In his affidavit, filed in connection with Hendricks's motion for a new trial, Trooper Carr explained three other witnesses, Karen Hunter (the victim's roommate), Kristi Oreb (the victim), and Kristian Kaufman (an employee of the city of Creswell) told Trooper Carr about a conversation with David Smith, the owner of a cabinet shop beneath the Oreb–Hunter residence on Tuesday, June 25, 1985. Mr. Smith claimed to have seen the victim after returning from a trip in Southern Oregon. Carr confirmed Smith had stayed in a Motel in Southern Oregon on Monday, June 24, 1985, and because the three witnesses all remembered speaking with Smith on Tuesday, June 25, 1985 instead of Wednesday, June 26, 1985, Carr concluded Smith had simply been mistaken about the date on which he had seen the victim.

District Attorney Hugi claims that while he knew. of the existence of the witness, Trooper Carr never informed him of the witness's name. In his affidavit, the district attorney stated:

> Prior to the filing of defendant's Motion for New Trial, I did not know of an individual by the name of David Smith or of any role a person by that name played in the investigation. During the investigation and preparation of the case, numerous meetings were held between law enforcement personnel and myself. During the early stages of the investigation ... Trooper Dennis Carr and I had a meeting in my office to discuss the case.... During the course of this meeting, Mr. Carr mentioned that he had come across a person who claimed to have seen [the victim] on Wednesday, June 26, 1985. Mr. Carr explained that he had investigated the witness's statements· and found them to be false. The person was not identified by name.... There was never a discussion that the statements were damaging or of taking steps to insure that they did not come to the attention of the defense....

Trooper Carr's affidavit recounted the police investigation into the validity and reliability of Smith's statement and the reasons why Trooper Carr's notes regarding Smith's statement were not forwarded to the District Attorney with other case materials.

■ Due process requires a prosecutor to disclose *material* exculpatory information in its possession to the defense. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). The prosecutor's intentions are irrelevant. *Brown v. Borg,* 951 F.2d 1011, 1015 (9th Cir.1991) (citing *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) and *Thomas v. Cardwell,* 626 F.2d 1375, 1382 n. 24 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981)). In *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the Court set out the test for determining whether a conviction should be reversed because the prosecutor failed to disclose requested evidence that could have been used to impeach prosecution witnesses. The test is whether the evidence is material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. Thus, the evidence must have been that which if disclosed to the defense, would have changed the result of the proceeding. *Id.*

The materiality test is the "equivalent to the *Chapman* harmless error test." *Brown v. Borg,* 951 F.2d 1011, 1015 n. 2 (9th Cir. 1991) (citing *Bagley,* 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9). Thus, we must determine whether the disclosure of David Smith's statements would have changed the outcome of the trial.

■ Hendricks filed a motion for new trial on the basis that the District Attorney had failed to disclose that David Smith claimed he had seen Oreb at her home during the time that she claimed she was in the woods having been raped and left to die. The State trial court in denying Hendricks's motion for a new trial found the evidence would not have changed the result of Hendricks's trial. The State post-conviction court found the District Attorney had not withheld exculpatory evidence. The district court agreed.

There was abundant evidence contrary to Smith's statements. When police went to Hendricks's home to arrest him, they found the car Oreb had·described, a 1978 burgundy Datsun. The car belonged to Hendricks's girlfriend who testified Hendricks had been in possession of the car during the time period that Oreb stated she was raped. Police found blood spatters and a tire iron with blood on it in the car. The wheel base of the car was measured and it matched the tire tracks found at the scene of the assault. There were additional witnesses who confirmed Hendricks and Oreb were together at approximately midnight on June 25, 1985.

Oreb was found on the afternoon of Thursday, June 27, 1985 by loggers in the woods. She was dirty, wearing bloodstained clothing. She told the loggers Hendricks had raped and beaten her. The loggers called for an ambulance and police.

Oreb testified she had been raped and beaten by Hendricks. There was uncontro-

verted evidence that she was found by the loggers 13 miles from the nearest residence, with severe injuries to her head, back, and neck that could not have been self-inflicted. Dr. Kasher, an emergency room surgeon, also testified the injuries were sufficient enough to create a substantial risk of death. Seminal fluid and spermatozoa were found inside Oreb's vagina.

The only evidence which tended to refute Oreb's account of the alleged rape and assault was the unpersuasive testimony of Hendricks and his girlfriend. Hendricks's girlfriend testified Oreb told her Oreb had been on methamphetamines and had said she would never again "do chemicals" because she could not remember anything that happened on the night of June 25, 1985. Hendricks's girlfriend testified in the nature of an alibi that Hendricks had telephoned her on the morning of June 26th to tell her he had loaned the keys to her car to a friend so that the friend could retrieve an item from the car, that the friend had mistakenly kept the keys and left, leaving Hendricks stranded until he obtained the keys a few moments before he telephoned. Finally, Hendricks's girlfriend testified Hendricks had a long deep cut on his hand on June 25, 1985 which would explain the blood spatters found in the car. Hendricks denied raping or trying to kill the victim. He testified the last time he saw Oreb was when he dropped her off in Springfield, Oregon at 10:00 p.m. on June 25, 1985.

Because the evidence provided to the jury is overwhelming that defendant raped and assaulted Oreb on June 25, 1985, there is not a reasonable probability that had David Smith's statements been disclosed to the defense, the result of the proceeding would have been different. Thus, we hold the allegedly exculpatory evidence which was withheld from the defendant is not material, as defined in *Bagley*, and we deny Hendricks habeas corpus relief on this issue.

## VI

■ Hendricks also contends he was denied due process of law because as an indigent defendant, his appointed attorneys were not provided by the State with the funds necessary to conduct an adequate pretrial investigation. He argues that had he been able to investigate promptly, he "would have most likely found exculpatory evidence which [would have] supported the facts as he wished to present them."

Hendricks alleges no facts in support of his contention that he was "denied access to prompt investigation." Moreover, the record reflects no timely request for additional funds for pretrial investigation. The issue did not arise until Hendricks filed a motion for a new trial. In arguing the motion, defense counsel told the trial court:

> We did not request of the Court money to send myself or Mr. Moursund [the defense investigator] or some third investigator back to Tennessee in an effort to locate Mr. Smith.... We elected not to pursue that partly because of the financial burden and the fact we were having difficulty in obtaining funds from the Court in any event.

Hendricks received approximately $2,500 for pretrial investigation. We hold Hendricks was not deprived of due process based on the State's alleged failure to provide funding for investigative expenses in a timely manner.

## VII

■ Hendricks argues his due process rights were violated when the Oregon Court of Appeals and the Oregon Supreme Court failed to overturn the trial court's sentence. He claims the trial court erred in failing to merge, for the purpose of sentencing, his conviction for kidnapping in the first degree with either his conviction for attempted murder or his conviction for rape in the first degree. He claims Oregon case law mandates the merger. Hendricks cites no authority for the proposition that a state appellate court's refusal to reverse a sentence on state law grounds is a violation of federal due process guarantees. There is no federal Constitutional right to merger of convictions for purposes of sentencing. Thus, we hold Hendricks's claim regarding merger of convictions for sentencing is exclusively concerned with state law and therefore not cognizable in a federal habeas corpus proceeding.

## VIII

■ Hendricks argues he was deprived of due process because the prosecution knowingly used perjured testimony. He contends

David Smith's statements to Trooper Carr prove the victim's testimony was perjured. There was overwhelming evidence to suggest the victim was not lying. Thus, we hold the prosecution did not use perjured testimony.

## IX

█ Hendricks also claims there was prosecutorial misconduct when the "prosecution told the jury to speculate in violation of all principles of State and Federal law." Hendricks makes no argument nor does he allege any facts in support of this claim. The record indicates that when this claim was raised on appeal, Hendricks cited several objections made by trial counsel to the prosecutor's closing argument. A review of the record establishes that in each instance of Hendricks's objection to the allegedly improper speculation, the court properly ruled the prosecutor was making arguments which are permissible during closing argument and the jury was capable of distinguishing the arguments from the evidence. We therefore affirm the district court's holding on this issue.

## X

█ Hendricks asserts the trial court's admission of his taped statement violated his right to due process. The trial court found Hendricks knowingly waived his right to counsel before making the recorded statements. This finding is supported by the record. Police read Hendricks his Miranda rights approximately 50 minutes after being arrested, but before making any statements to the police. He spoke with his mother, his brother, and his roommate during the 50 minute period between his arrest and the first reading of the Miranda warnings. After being advised of his rights, Hendricks indicated he understood his rights and he would waive them and speak with police. We hold Hendricks knowingly and voluntarily waived his right to counsel before he made the taped statements.[4]

## XI

█ Petitioner argues "[t]he dangerous offender statute as applied to the petitioner is cruel and unusual punishment and violates

his constitutional right." The Supreme Court has deemed enhanced sentence laws Constitutionally valid. In *Spencer v. Texas,* 385 U.S. 554, 560, 87 S.Ct. 648, 651, 17 L.Ed.2d 606 (1967), the Court stated:

> Such statutes ... have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, *cruel and unusual punishment,* due process, equal protection, and privileges and immunities.

*Spencer,* 385 U.S. at 560, 87 S.Ct. at 651 (footnote and citations omitted; emphasis added). We affirm the district court's holding that Hendricks has made "no cogent legal argument" nor has he "articulated any cognizable Constitutional challenge to the statute generally or identified any specific circumstances which would render the statute unconstitutional as applied to [him]."

## XII

Because Hendricks never requested to proceed pro se and was not apprised of the dangers of self-representation, he did not knowingly and intelligently waive his right to counsel on appeal. Furthermore, his conduct was insufficient to constitute a forfeiture of this important right. We hold the Oregon Court of Appeals wrongly denied Hendricks's motion for substitution of counsel without an appropriate inquiry into the nature and extent of the conflict between Hendricks and his counsel. We therefore reverse and remand to the district court to issue the writ and determine a reasonable time in which the State of Oregon shall grant Hendricks a new appeal where Hendricks will be given the benefit of appointed counsel unless he knowingly and intelligently elects, as required by law, to proceed pro se. As to Hendricks's other contentions, we hold the allegedly exculpatory evidence which was withheld from Hendricks is not material, and we affirm the district court's denial of habeas corpus relief on this issue. We affirm the district court's holding that Hendricks was not deprived of due process based on the State's alleged failure to provide funding for investigative

4. Hendricks claims because the State Trooper testified to the statements Hendricks made, "the introduction of the tape recording was unduly prejudicial and required the jury to place undue emphasis on that particular piece of evidence." We have examined this contention and find it also to be without merit.

expenses in a timely fashion. We affirm the district court's holding that Hendricks's claim regarding the merger of convictions under state law is not cognizable in a federal habeas corpus proceeding. We affirm the district court's holding that the prosecutor did not use perjured testimony. We affirm the district court's holding that the trial court correctly ruled the prosecutor was properly arguing and the jury could distinguish the arguments from the evidence. We affirm the district court's holding that the State trial court properly admitted Hendricks's recorded statement into evidence. Finally, we affirm the district court's holding that the dangerous offender statute as applied to Hendricks does not constitute cruel and unusual punishment.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**