**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ruben ZUNO–ARCE, Defendant–**
**Appellant.**

**No. 93–50311.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1994.

Decided Jan. 11, 1995.

As Amended Feb. 13, 1995.

---

Edward M. Medvene, Mitchell, Silberberg & Knupp, Los Angeles, CA, for defendant-appellant.

John L. Carlton, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: WALLACE, FARRIS and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Zuno–Arce was convicted of conspiring to kidnap, torture, interrogate and murder DEA Agent Enrique Camarena–Salazar, and related crimes. His appeal raises numerous questions of criminal law, procedure and evidence.

According to the counts of the indictment for which Zuno–Arce was convicted, he was part of an international narcotics enterprise based in Guadalajara, Jalisco, Mexico. The indictment calls it the Guadalajara Narcotics Cartel. Enrique Camarena–Salazar, an agent of the United States Drug Enforcement Agency, was, according to the government's evidence at trial, tremendously successful during 1984–85 in the performance of his duties. Billions of dollars worth of marijuana were seized in a single raid at "El Bufalo," a ranch owned by another of the cartel's members, Rafael Caro–Quintero.

The cartel struck back violently. Agent Camarena was kidnapped in February 1985, taken to Caro–Quintero's house at 881 Lope de Vega in Guadalajara, and interrogated and tortured for two days. The interrogation was directed at finding out what information Camarena had about the cartel. After getting the information, the criminals murdered Agent Camarena and buried him.

### 1. Prosecutorial Misconduct

■ Zuno–Arce claims that the prosecutor knowingly put on false evidence, so the indictment against Zuno–Arce must be dismissed with prejudice, or at the least, he must be given a new trial. Zuno–Arce did not raise the issue of prosecutorial misconduct below. He moved only for a new trial because the verdict was against the weight of the evidence. Therefore, we review it for plain error only. *United States v. Dischner*, 974 F.2d 1502, 1515 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993).

Zuno–Arce was tried twice. He was convicted the first time, but the district court granted him a new trial because the prosecutor made an inappropriate reference in closing argument. In the first trial, the main witness connecting Zuno–Arce to the conspiracy was a man named Cervantes. In the second trial, the government did not use Cervantes. Its main witnesses were Godoy and Lopez. In each case, the government's evidence established that Zuno–Arce attended and spoke at several meetings at which the cartel planned the kidnapping and murder. The issue arises from discrepancies about when and where the meetings occurred. With regard to these details, Godoy and Lopez put the meetings at different times and places from Cervantes, with different people present.

■ The district court did not abuse its discretion in denying a new trial based on this conflicting testimony. If the jury believed Godoy and Lopez, the evidence sufficed to establish that Zuno–Arce attended and participated in the meetings as they said. As for whether they lied, or erred in their perceptions or recollections, the judge prop-

erly left these questions to the jury. *Swan v. Peterson,* 6 F.3d 1373, 1382 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994). Zuno–Arce's attorneys cross-examined Godoy and Lopez thoroughly and well on the discrepancies in their recollections, and the recency of some of their recollections. The district court was not obligated to decide the credibility question and strike their testimony, because the determination of credibility is for the jury. *United States v. Candoli,* 870 F.2d 496, 506 (9th Cir.1989).

■ The prosecutorial misconduct claim presents a slightly different question. In some cases, a prosecutor might knowingly put on false evidence entitling a defendant to a new trial or dismissal. *Thomas v. Cardwell,* 626 F.2d 1375, 1381 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). In this case, though, Zuno–Arce presents no argument or evidence for his proposition that the prosecutor knowingly put on false evidence, except for the contradictions between Cervantes at the first trial and Godoy and Lopez at the second. This evidence does not conclusively prove that the prosecutor knew that the Lopez and Godoy testimony was false.

Lawyers in criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily trust the jury to determine what is true, or whether reasonable doubt remains about what is true. Rarely will a retrial produce exactly the same evidence as the first trial, yet appellant's argument suggests invalidity of the verdict in the second trial whenever the testimony varies. Discrepancies in the testimony about the details of 1984 meetings during trials in 1990 and 1992 could as easily flow from errors in recollection as from lies. It is hard to see how the prosecutor could know who was at which meetings, or when and where they occurred, except for what people who said they were there told him. Zuno–Arce has offered no evidence whatsoever for prosecutorial misconduct except for the inference from discrepancies. That inference is too weak to vacate the district judge's exercise of discretion in denying a new trial. *A fortiori,* no sufficient showing of prosecutorial miscon-

duct was made, since such actions will only lead to a new trial if "the prosecutor's conduct 'materially affected the fairness of the trial.'" *United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986) (quoting *United States v. McKoy,* 771 F.2d 1207, 1212 (9th Cir.1985)). This is especially true when we review under our plain error standard of review, applicable because this was not raised below.

### 2. RICO Sufficiency

■ Two of Zuno–Arce's convictions are RICO violations. He argues that the government presented no evidence from which a jury could infer that he was a member of the cartel, or that he acted with a purpose of maintaining his position in the cartel. Here is the relevant statutory language:

§ 1959. Violent crimes in aid of racketeering activity

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or *for the purpose of* gaining entrance to or *maintaining or increasing position in an enterprise* engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—

18 U.S.C. § 1959. (emphasis added). Zuno–Arce's argument is that several witnesses, including the DEA resident agent in charge of the Guadalajara office, had no knowledge that he was involved with any of the cartel activities. Zuno–Arce also points out that the person who ran a radio network for communications between cartel leaders Caro–Quintero and Ernesto Fonseca testified that, despite continual monitoring of radio traffic, he did not recognize Zuno–Arce's voice or hear his name.

The government put on testimony by Godoy that meetings of the cartel members were held to discuss what to do about Ca-

marena and the DEA. Zuno–Arce attended, spoke, and personally suggested that the criminals kidnap and kill Agent Camarena:

> A: ... And then Ruben Zuno–Arce said that if the D.E.A. agent didn't want to take anything or didn't want any deal then it was time to drop him.
>
> Q: Excuse me, Mr. Godoy. What did you understand that to mean?
>
> A: That would be to kidnap him and to kill him.

Zuno–Arce urged at another meeting as well that the criminals kidnap Agent Camarena:

> Q: Did you hear anything else?
>
> A: I heard Ruben Zuno say, "That [f__ing] gringo. What is he doing here in Mexico? It's not his [f__ing] country. We have to pick him up."

There was also direct evidence that Zuno–Arce referred to the cartel as "us."

> Q: What was it you heard?
>
> A: Rafael Caro–Quintero asked Enrique Alvarez del Castillo whether they already had all the information about the D.E.A. And Alvarez del Castillo answered, "I already have my people working."
>
> Caro–Quintero got angry. He got very angry and said, "Give me all the information about these people very soon so I can resolve this problem with these D.E.A. people."
>
> And the governor seemed to be affected and Rafael continued to pressure him, asking for all the data.
>
> And Mr. Zuno said, "Calm down, Rafael. Can't you see that the governor is already getting us all the information. This operation has to be done properly and calm, and it has to be properly planned so that everything works out properly."

From this evidence, a jury could reasonably infer that the cartel was a group and Zuno–Arce was a member. Zuno–Arce, they could infer, had sufficient standing in the criminal cartel to be able to speak sharply to one of its leaders and get him to react more reasonably. He tells the leader to "calm down," and says "the governor is already getting *us* all of the information."

Reviewing this evidence in a light most favorable to the prosecution, as we must, we find that a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Bishop,* 959 F.2d 820, 829 (9th Cir.1992). Zuno–Arce argues that certain witnesses' failure to mention him, and the radio operator's inability to specifically recognize Zuno–Arce's voice on the Caro–Quintero/Fonseca radio network, compel a verdict in his favor. But all his argument establishes is that rational jurors might have inferred his innocence from other testimony, and doubted or disbelieved the testimony about direct involvement. That does not establish insufficiency of evidence.

### 3. Depositions

■ Zuno–Arce had owned the house at 881 Lope de Vega for years. That is where Agent Camarena was held, interrogated and tortured. A couple of weeks before the kidnapping, Zuno–Arce had sold the house to someone else, who immediately sold it to another of the criminals in the group, Rafael Caro–Quintero. The government bolstered its case against Zuno–Arce by connecting him with the house, and suggesting that the sale was a sham. Three weeks before trial was scheduled, Zuno–Arce moved for leave to take depositions of four witnesses in Mexico, in order to get testimony that the sale was bona fide.

■ In criminal cases, depositions may be taken only in "exceptional circumstances." Fed.R.Crim.P. 15(a). The district judge denied leave in this case, because Zuno–Arce made an insufficient showing that the witnesses would be unavailable to testify at trial, that they would testify to something relevant at depositions in Mexico, and that there was sufficient justification for making such a motion so close to trial. He did not abuse his discretion in so ruling. *United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1569 (9th Cir.1989), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990).

■ The district judge focused appropriately on unavailability, good faith effort to obtain the witnesses' presence at trial, *United States v. Sindona,* 636 F.2d 792, 803–04 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), whether the movant had demonstrated that the expected testimony would be favorable, *United States v. Nichols,* 534 F.2d 202, 204 (9th Cir.1976), and whether the deponents would be available for deposition and willing to testify. *Id.*

Zuno–Arce presented an attorney's affidavit that suggested what the substance of the deposition testimony would be. According to the attorney affidavit, one of the deponents, a Mexican real estate agent, would say that he and his brother had bought the house from Zuno–Arce in a legitimate, arm's length transaction, and their two nephews had sold it to Caro–Quintero. None of the four real estate people were willing to go the United States to testify, because of arrests and interrogations they had been subjected to since the Camarena kidnapping. According to the affidavit, the nephews "have since refused to discuss this matter with anyone," and none of the four "is willing to travel to the United States and testify on Mr. Zuno–Arce's behalf *or otherwise assist in his defense.*" (emphasis added). The affidavit even went so far as to say that the deponents "would not even be willing to meet with defense counsel."

Another witness, unrelated to the house sale issue, would have impeached Godoy on various details of where and whether certain meetings took place, but he too would not be willing to travel to the United States to testify about it.

None of the witnesses volunteered to testify at a deposition. The house sale witnesses expressed a firm and unequivocal intention not to cooperate in any way. All this evidence was peripheral to the main issues. Godoy was heavily and independently impeached. It did not really matter much whether the sale of the house was a sham. The district judge had good reasons for deciding that this was not a case where "due to exceptional circumstances it is in the interest of justice," Fed.R.Crim.P. 15(a), to take the depositions, and did not abuse his discretion.

**4. Brady**

Zuno–Arce claims the government hid exculpatory DEA and FBI interviews from him until after the evidence was closed. He moved for a new trial under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and when that motion was denied, moved for reconsideration.

■ To prove a *Brady* violation, a defendant must show that the government withheld material, exculpatory evidence. *Hendricks v. Zenon,* 993 F.2d 664, 673 (9th Cir.1993). In order to be deemed material, "the evidence must have been that which if disclosed to the defense, would have changed the result of the proceeding." *Id.* We review a district court's denial of a new trial motion based on alleged *Brady* violations de novo. *United States v. Woodley,* 9 F.3d 774, 777 (9th Cir.1993). We consider below whether the material was exculpatory, second, whether it was not produced when it should have been, and third, whether the failure timely to produce the exculpatory material mattered.

Both of the interviews at issue were of the same man, a former agent of the Mexican Federal Judicial Police, and both discussed the Camarena murder. In the DEA interview, in April 1991, the agent said he had interrogated a Mexican police commandante, who said that he had been present during the torture of Camarena, and "also present" were seven other men and women. Zuno–Arce's name was not among the people the commandante named. The "indexing section" of the report does not list Zuno–Arce, and he is not mentioned anywhere in the report.

The FBI interviewed the same former Mexican police agent in September of 1992. In this second interview, the agent says that he rounded up and helped to torture a number of Mexican police and others directly involved in the Camarena murder investigation. The agent says that on the basis of what they told him during the torture and interrogation, "DEA agent Camarena was abducted because of his romantic relationship with Sara Cosio, a paramour of Rafael Caro–

Quintero." The source also identifies a physician who "was present during the torture of Camarena and, in fact, assisted by keeping Camarena alive during the long interrogation." The agent told the FBI the names of people who his tortured prisoners said were at the Lope de Vega house on the night Camarena was murdered. Zuno–Arce was not mentioned as being present during the torture and interrogation of Agent Camarena. Zuno–Arce is not mentioned in the report at all.

■ First, were the reports exculpatory? Zuno–Arce makes two arguments for why the reports were exculpatory. First, he says that naming others as present in the house, and not him, tends to show that he was not there. This inference is too weak in this case to amount to exculpatory evidence. The district judge correctly relied upon *United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir.), *cert. denied*, 493 U.S. 858, 110 S.Ct. 167, 107 L.Ed.2d 124 (1989), in so holding. *Bryan* establishes that not every witness statement which fails to inculpate a defendant should be treated as exculpatory. *Id.* As the district judge said, the torture took place over two days, the statement does not show when the people who told the agents who was present were there themselves and when they were absent, and does not establish that Zuno–Arce was not there during the torture. Nor does the language of the witness statement suggest that the agent purported to list all persons who were present at any time during the torture. The Godoy testimony, if believed, would suffice to convict, even if Zuno–Arce was never there. A person who helps plan and direct a murder does not need to be physically present when his plans are executed, to be criminally responsible. The district judge did not err in ruling that this 1991 DEA interview did not amount to exculpatory evidence, so could give rise to no *Brady* violation.

■ The district judge treated the second interview, the one taken by the FBI on September 9, 1992, as exculpatory. The statement says that Camarena's torture and murder was motivated by love instead of money. This conflicted with the government theory. The defense would have been able to argue, if it could produce evidence consistent with the statement, that the murder was revenge by Caro–Quintero against Camarena for developing a romance with Caro–Quintero's girlfriend, Sara Cosio. That motivation would have weakened the inference that Zuno–Arce had anything to do with it, even if he was part of the cartel.

The exculpatory power of the evidence is not without doubt. Just as a person seeking to advance himself in a legitimate enterprise might do personal favors for his supervisor, so might a gangster kill an interloper on his supervisor's romantic relationship in order to advance himself in the gang. But in this case, Godoy and Lopez both testified that the motivation for the torture and murder of Camarena was to end his interference with the narcotics business. Godoy said that Camarena's interference with the narcotics business was Zuno–Arce's stated reason for why Camarena should be kidnapped and murdered. In this context, evidence that the murder was motivated instead by Camarena's romance with Caro–Quintero's girlfriend would tend to be exculpatory. We, like the district judge, proceed on the basis that the second statement was exculpatory.

The next issue is whether the report was turned over when it should have been. The prosecutors say that they got a phone call from the Chief of the Narcotics and Dangerous Drugs Section of the Department of Justice during the noon recess Thursday, December 10. She told them that the Department "had recently learned of a potential *Brady* issue arising from an interview conducted by the FBI in Phoenix." That night the prosecutor got a fax of the report of the 1992 interview. A DEA agent's affidavit said that the FBI in Phoenix was not investigating the Camarena murder, and conducted the interview in connection with a different investigation.

The prosecutors did not call defense counsel or give them a copy of the exculpatory report Thursday night when they got it, or the next court day, Friday, or over the weekend. The prosecutors said they were busy working on oppositions to defense motions, so did not figure out what to do with the statements he had received Thursday night

until the weekend. They filed a copy under seal with the court Monday morning at 8:00 a.m.

The judge was suspicious of the timing:

Now I want to take up something that is very disturbing to me, and that is this statement that you submitted to the Court under seal on Monday morning, which in the view of the Court was clearly—contained exculpatory information with respect to Dr. Alvarez, and which was in the hands of the government since September 9th, 1992 ...

 * * * * * *

It seems to me that any government agent knowing that that case was pending, and soon to go to trial, would realize that this was the type of information that should be provided to the defense counsel, yet it did not surface until the day the Court granted the judgment of acquittal [for Dr. Alvarez].

So an ugly thought runs through the Court's mind, whether it would have surfaced at all had that not occurred.

I want you to address some of these concerns that I have.

The judge is referring here to Zuno–Arce's codefendant, a doctor prosecuted for participating in the torture by keeping Camarena alive so that it and the interrogation could be extended. *The government prosecuted a different physician* from the one named in the statement given to the FBI on September 9, 1992. The government rested its case Thursday afternoon, and filed the statements under seal Monday morning, but did not give them to defense counsel. Later Monday morning, before the defense had seen the statements, the court granted the doctor's motion for judgment of acquittal. There is not much significance to saying that the prosecution filed the statement under seal within two working days of when the prosecutors received it. Two working days probably would not have mattered at all a month or two before trial, but they were absolutely critical when the government had just rested. At that precise time the defense had to decide whether to call witnesses and which ones, whether to have the defendant testify,

and generally how to proceed. If the prosecution delayed turning over the exculpatory report until the defense could no longer make practical use of it, that is close, in practical effect, to not turning it over at all.

■ Even if the prosecutors were not hiding the statement until the defense could no longer make practical use of it, it is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation. Prosecutors and investigators must often be tempted, in the service of what they see to be justice and protection of the public from crime, to increase the probability of success by depriving the defense of evidence which might tend, in their view, to confuse and mislead the jury. Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them.

It is true that the "prosecutor need not comb the files of every federal agency which might have documents," and that the disclosure obligation "should turn on the extent to which the prosecutor has knowledge of and access to the documents." *Bryan*, 868 F.2d at 1036. However, the prosecutor is "deemed to have knowledge of and access to anything in the custody or control of any federal agency participating in the same investigation of the defendant." *Id.* Possibly the documents would not have turned up in a search for documents relating to the "Zuno–Arce case," because Zuno–Arce is not mentioned in them. But if all agencies involved in the case were instructed to turn over witness interviews bearing on the "Camarena murder case," these reports would have been referenced. We, like the district court, proceed on the basis that the exculpatory FBI report was improperly withheld.

The third issue is whether the late disclosure mattered. Once the materials were disclosed, defense counsel moved for a mistrial.

The district judge denied the motion for mistrial, but invited the defense to "make any post-trial motions that you think are appropriate." The seriousness of this invitation was plain, because after the last trial, the judge had granted the post-trial motion and ordered a new trial. Following the jury verdict, Zuno–Arce did move for a new trial. The question that remained, was whether or not the late-disclosed materials, if tendered to the defense sooner, would allow the district judge to say that there was a reasonable probability that, but for the nondisclosure, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682–83, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985).

Judge Rafeedie evaluated the evidence in exactly the manner which *Bagley* said was correct, and which we recently restated in *Hendricks v. Zenon,* 993 F.2d 664, 673 (9th Cir.1993). He correctly evaluated it to see whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. *Hendricks* involved alibi evidence, which if believed, would have required acquittal, but was overwhelmingly demonstrated to be incorrect by other evidence, so that there was no reasonable probability that it would have changed the outcome. *Hendricks,* 993 F.2d at 674. Similarly, Judge Rafeedie concluded that there was no probability that the outcome would have been different if the DEA interview had been given to the defendant.

When ruling on the motion for a new trial, three months after the end of the case, he first noted as follows:

Looking at the evidence provided to the defendant by the disclosure of documents ordered by the Court, the Court is unable to find that there is any such probability that the result would have been different.

First, I have to note, that the Court's main impetus in providing the discovery at the time that it did was to enable the defendant to see based on that discovery whether or not they could during the two months that have passed, two and a half months since the defendant was convicted, whether indeed investigation of those factors set forth in those reports could produce some new evidence or some evidence that might have been available and is found at this time.

I have to note that since that date nearly three months ago, the defendant has not come forward with any evidence, has not shown how this might have helped his case, in the form of statements or declaration or affidavits by parties which suggest that any of the persons named by the informants would exculpate the defendant Zuno in any manner.

The defendant is required to convince the Court under this ruling, that is under the state of the law, that the evidence withheld would have led to a different result at the trial. Aside from mere speculation, the defendant has not done so.

Judge Rafeedie's analysis was careful and correct. The defense could not have proved anything with a DEA agent saying that a third person had told him that others, under torture, had made statements which led the third person to conclude that Camarena's murder was for love, not money. *See United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (holding that the evidence was not admissible and would not have changed the defendant's presentation of the case), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). The defense had not used the reports to generate admissible evidence in the intervening three months between disclosure of the materials and the hearing on the motion for a new trial. The defense had been given Sara Cosio's name as a percipient witness much earlier. The district judge noted that and concluded that "[i]n regard to Sarah Cosio and El Changa, the defendant had access to their names prior to this latest disclosure, because they were among the list of percipient and not testifying witnesses, ... [s]o the failure to disclose, in the view of the court, did not have an adverse effect...."

As for whether the defense could have produced testimony from people who were present during the torture, and would say

that Zuno–Arce was not, the judge drew the pragmatic inference that it was extremely unlikely that such evidence could have been produced regardless of when the reports were disclosed. He thought it unlikely that anyone would come to the United States and testify in court that "I was there the whole time Camarena was being tortured, and the whole time it was being planned, and Zuno–Arce was never there." Even if such a witness had been found, the testimony would have been merely cumulative to the impeachment of Lopez and Godoy.

The defense got another chance to show that the late disclosure mattered. It filed a motion for reconsideration, to which the defense attached an affidavit from the proprietor of a restaurant in Guadalajara. The restaurant proprietor said that on the day he was kidnapped, Agent Camarena ate lunch with Sara Cosio, another woman, and two men, got drunk, was "affectionate and romantic," to Sara Cosio and that the two were "sitting very close together, engaging in mutual hugging and kissing. . . ."

The district judge rejected the argument that this evidence would have had a reasonable probability of changing the outcome of the trial. The reason was the tape which the criminals made of the torture. The judge said:

Even if you had a witness who could competently testify that the reason Camarena was abducted, in the face of that very graphic interrogation and torture tape that was available, it was very clear from that alone, together with other evidence that was presented at trial, that it is extremely unlikely that this evidence, even if presented by competent witness, would have undermined the confidence in the outcome and would necessitate or result in a different outcome.

We have carefully examined the transcript of the torture tape, as well as the restaurant proprietor's declaration, the DEA and FBI interviews, all the declarations filed in district court relating to this issue, and the remainder of the record. The torture went on for two days. The tape recorder appears to have been turned on when the torturers had Agent Camarena talking, perhaps so that they could conveniently share the information with the rest of their criminal gang, and to have been turned off while they were interrupting the talk to hurt him more. There is not a single reference during the two days of torture to Sara Cosio. All the talk consisted of interrogation of Agent Camarena for the names, addresses, house descriptions, directions for finding houses, businesses, dates, amounts of money, information obtained, associates, who "put the finger on" whom, surveillance practices, telephone numbers, and so forth. Here is a representative sample from the middle of the interrogation ("C" refers to Camarena and "I" refers to the interrogator):

I: What name?

C: Well, that it was Barba . . . Javier Barba . .?

I: Yes . . .

C: OK, and we knew he was working with Ernesto, and one of the things we check at the office every day is the newspaper, specifically the police section to see if a name comes out that we know . . .

I: And who passed you the information on Javier Barba . .?

C: Lic. Garcia Bueno . . .

I: Who else . .?

C: And . . . this Jesus Ramirez . . .

I: What did Jesus Ramirez tell you . .?

C: Well, that he is one of the ones who is coming up . . . he told us this a week ago . . . two weeks ago, the last time we saw each other in the Tapatio.

I: When he talked to you did he speak of Samuel . .?

C: No . . . Jesus Alvarez spoke to me of Samuel . . there are two Jesuses . . .

I: Two Jesus Alvarez's . .?

C: No, no, no, there is one Je . . . two Jesuses . . . one Jesus Ramirez and one Jesus Alvarez . . .

I: Then this Samuel has a relationship with Lic. Barba . . .?

C: I could not tell you . . . I do not know . . . I do not know this person . . .

I: Or relations with —— person . .?

C: I did not understand your question .. (background voices: no, yes, not me now, no, no, ...)

I: Lic. Barba by you (unintelligible)

C: Look! The reason we were interested in this Samuel was because Jesus Alvarez was the one who told us that he was the one that had shot up Rogelio's car ...

I: What more did he say ..?

C: That he had an apartment over in Cangrejo ...

I: Yes, you already told me that!

C: Yes, well, that is what I am telling you, sir ...

I: And, and you ... (recording cut)

C: We do not have ... (recording cut)

I: You already told me what he has done ...

C: Oh ... bas ... (exclamation)

I: (another interrogator): Well look ... No, no. don't be stupid ... what ... who has ..?

C: (speaking with difficulty) who goes around with (breathing hard) or who helps Ernesto Fonseca ...

I: And what else ..?

C: (again breathing hard and speaking with difficulty) that he is one of the ones who is rising at this time ...

I: And what do you know about him ...? what has he done ..?

The district judge correctly concluded that it would be extremely improbable that jurors, in the face of the details of the two-day interrogation and the other evidence presented that showed Zuno–Arce to be involved in the kidnapping and torture, would accept the theory that Camarena was abducted and murdered as revenge for his involvement with Sara Cosio. Had the defense theory been correct that Camarena was killed because of a spur of the moment rage Caro–Quintero felt when he heard that Camarena was romancing Sara Cosio, one would have expected something about Sara Cosio and Camarena's romantic involvement to be mentioned during the torture. It was not. Nor, if that were the motive, would it have made sense to obtain by excruciating torture two days of details affecting the business of the narcotics gang.

Godoy and Lopez testified that the motive for the kidnapping was Camarena's knowledge of the cartel's activities. The tape recordings of Camarena's torture and interrogation corroborated their testimony. The torture transcript tended to prove that the reason for the kidnapping was the cartel's interest in knowing what information the DEA had. During the two days of torture recorded on tape, Camarena was not questioned about Sara Cosio, or told that he was being punished for his involvement with Cosio, even a single time. The district judge did not err in determining that "[t]he tapes establish the motive for the kidnapping and this testimony, whatever it might be, simply cannot impeach the verdict." He correctly evaluated the evidence to see whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. There was not.

### 5. Macias–Barajas

 In the first trial, a witness named Macias–Barajas testified that the government had put a great deal of pressure on him to testify against Zuno–Arce. He did not testify in the second trial. Zuno–Arce wanted to have the transcript of his testimony from the first trial read, so that the jury might infer that Godoy and Lopez testified the way they did because of government pressure. The judge denied the request, despite unavailability of Macias–Barajas, because it was irrelevant. We review a district court's decision regarding relevancy for abuse of discretion. *United States v. Daly,* 974 F.2d 1215, 1216–17 (9th Cir.1992). The ruling was not an abuse of discretion. The inference that if Macias–Barajas was pressured, Godoy and Lopez must also have been pressured, is too weak to make the denial of the request an abuse of discretion.

**AFFIRMED.**