**Donald G. SAGER, Petitioner,**

v.

**Manfred MAASS, Respondent.**

**No. CV 92–1110–PA.**

United States District Court,
D. Oregon.

Feb. 22, 1995.

Anthony Bornstein, Assistant Federal Public Defender, Portland, OR, for Petitioner.

Theodore R. Kulongoski, Attorney General, Lynn David Larsen, Assistant Attorney General, Department of Justice, Salem, OR, for Respondent.

## OPINION

PANNER, District Judge.

Petitioner Donald Gordon Sager petitions for habeas corpus relief under 28 U.S.C. § 2254 and moves for an evidentiary hearing. Respondent Manfred Maass opposes the petition.

I deny petitioner's motion for an evidentiary hearing and grant his petition for habeas relief. Respondent must either retry petitioner within ninety days or release him.

## BACKGROUND

Petitioner was convicted of robbing Robert Lee Wieberdink at gunpoint in Salem, Oregon. The conviction cannot stand because petitioner's trial attorney was ineffective and petitioner was not warned about the dangers of representing himself at sentencing.

## I. The Robbery

At trial, Wieberdink testified that on May 20, 1986, he visited Vicki Stocker to ask for a ride to Portland. Stocker's roommate, Tina Flores, was present, and petitioner was outside nearby changing the oil on his bus.

Wieberdink testified that he did not want petitioner going with him to Portland because he had heard recently that petitioner was associated with the Gypsy Jokers, a motorcycle club. Wieberdink, who had relatives in the Outsiders, apparently a rival motorcycle club, said that most Gypsy Jokers "ain't to be trusted." 1 Tr. at 132. Other than Wieberdink's testimony, no evidence at trial linked petitioner to the Gypsy Jokers.

Flores testified that Wieberdink accused petitioner of being a "rat" and stealing marijuana plants from him. (Wieberdink testified that he and a partner had been growing marijuana for sale in the house he was renting.) Flores testified that after Wieberdink left, she told petitioner what Wieberdink had said about him. Petitioner was not pleased.

Wieberdink went to a bank near his house to exchange hundreds of dollars in ten- and twenty-dollar bills for larger bills. The transaction was apparently unusual enough that the teller asked Wieberdink where he had obtained the money. Wieberdink said he had sold motorcycle parts. Wieberdink testified that this exchange occurred hours, perhaps half a day before he was robbed. However, the teller testified that she saw Wieberdink talking to police officers across the street about thirty minutes after he had left the bank.

After Wieberdink had returned to his house from the bank, Stocker knocked on his door. Wieberdink testified that when he answered the door, petitioner barged in carrying a small automatic handgun and said, "I hear you don't want to be seen with me." At trial, Wieberdink testified that he "didn't have much time to say anything. [Petitioner] just started swinging." 1 Tr. at 65. However, when Wieberdink was interviewed by police shortly after the incident, he said that petitioner had argued with him before striking any blows. Wieberdink later required four stitches for facial cuts.

Wieberdink testified that he was on the floor when petitioner said something like, "You punk. You ought to be blowed away," and fired the gun towards the floor "right next" to Wieberdink's head. However, during interviews with police officers after the incident, Wieberdink never claimed that petitioner had fired a shot at him. Not until trial did Wieberdink add this dramatic touch to his story.

Wieberdink testified that he surrendered his wallet after petitioner demanded it at gunpoint. After petitioner left, Wieberdink went to a restaurant nearby and telephoned the police:

RW: A guy just robbed me.

CO: Okay, what do you mean by "robbery"?

RW: He beat me up and took my money. Held a gun to me.

CO: Where did this happen?

RW: At my house, 1147 S.E. Oak.

. . . .

RW: He's driving a big, kind a [sic] bluish gray bus. His name's Nazi Red and he's got over $1,000 of mine.

CO: Nazi Red?

RW: Yeah. And he's driving a big gray bus. He's still parked in front of my house when I left.

. . . .

RW: Yeah. A bus. The police know him in this town real well.

CO: Okay. Is he white male?

RW: Yeah. White man, big red beard.

CO: Okay. And does—what kind of gun did he have?

RW: Uh, some kind of small automatic, 9 mm I think.

. . . .

RW: He's got about $1,400 of mine.

. . . .

RW: And he's, uh, he's with the Gypsy Joker Club, uh, motorcycle club.

CO: Alright but—

RW: And he's affiliated, affiliated with 'em or something.

A few days after the incident, Wieberdink gave police a spent .38 caliber automatic cartridge, which he claimed to have found in the entryway of his house. Wieberdink still did not allege that petitioner had fired a shot at him, saying instead that petitioner's gun had gone off during the fight. *See* Petitioner's Memorandum in Support of Petition at 21.

It was not extraordinary to find a spent cartridge in Wieberdink's house. Wieberdink owned rifles and handguns that he fired inside the house, which was to be demolished.

No handgun, bullet hole, or slug from the alleged shot were ever found. Police did recover a box of .38 caliber ammunition from petitioner's bus.

## II. The Trial

Petitioner was charged with

unlawfully, feloniously and knowingly us[ing] physical force upon Robert Wieberdink, and [being] armed with and threaten[ing] to use a deadly weapon, to-wit: a firearm pistol, while in the course of committing theft of property, to-wit: a wallet, with the intent of preventing resistance to said defendant's taking of the said property.

Resp. Exh. 102. Petitioner's first attorney was forced to withdraw before trial because of a client conflict. Petitioner then retained attorney Jane Aiken.

Petitioner defended on the theory that he fought Wieberdink after an argument, but did not have a gun or rob Wieberdink. Because petitioner and Vicki Stocker, the only other witness to the incident, did not testify, the prosecution's case depended entirely on whether the jury believed Wieberdink.

Just before trial, Aiken learned that Wieberdink had been arrested in California for drug and explosives charges, and that there was an outstanding October 1986 fugitive warrant for his arrest. However, the trial judge excluded this potential impeachment evidence after Aiken failed to cite authority for its admission. *See State v. Sheeler*, 15 Or.App. 96, 100, 514 P.2d 1370 (1973) (error to exclude evidence that complaining witness was not prosecuted for potentially criminal conduct; admissible to show witness may have been "motivated in part by some expectation that he would personally gain"); *State v. Rodriguez*, 115 Or.App. 281, 286, 840 P.2d 711 (1992) (any evidence that crucial prosecution witness had an arrest record would be relevant to bias); *State v. Presley*, 84 Or. App. 1, 5, 733 P.2d 452 (1987) (fact that state dropped pending theft charges against witness was relevant to bias; fear of being indicted, whether or not justified, may influence witness's testimony).

During his direct testimony, Wieberdink referred to petitioner as "Nazi Red" and "Nazi." Aiken did not object, although Wieberdink and other witnesses also referred to petitioner simply as "Red."

When the prosecutor moved to play the tape-recording of Wieberdink's 911 call, Aiken objected, but only on authenticity grounds. The trial judge overruled her objection. Although Aiken was apparently ignorant of the tape's contents, she did not request a continuance to listen to it.

Aiken presented two witnesses, Flores and Starla Richmond, who testified that Wieberdink had gloated about setting up petitioner by falsely claiming a robbery. Richmond testified that she had seen Wieberdink with a large amount of cash shortly after the alleged robbery.

To impeach Wieberdink's testimony that he had not purchased 9 mm ammunition, Aiken introduced records of handgun ammunition purchases kept by a sporting goods store. The store records indicated that a Robert Wieberdink had purchased 9 mm ammunition on April 28, 1986. Aiken introduced Wieberdink's entire victim impact statement as a sample of his signature to compare with the Wieberdink signature on the store records.

At a deposition after the trial, petitioner testified that he argued against introducing the victim impact statement but Aiken insisted that she knew what she was doing. The trial judge recently stated that in the several hundred criminal trials he had presided over, he had "never seen another instance in which a defense attorney has offered a Victim Impact Statement into evidence." Exh. Z, at 2.

There are no copies of the victim impact statement in the record, so I must reconstruct its contents from circumstantial evidence. Victim impact statements were prepared by the District Attorney's Office with the victim for the trial judge to consider at sentencing. Aiken told an investigator for petitioner that victim impact statements sought "information concerning the effect of the incident on the victim's life. Another section allows the victim to express his opinion about the appropriate sentence, and another section covers the restitution sought by the victim." Exh. D, at 2.

At his post-trial deposition, petitioner testified that the victim impact statement included "something to the effect that it injected my past record, 'He should never have been let out.'" Sager Depo. at 27. In an affidavit, Aiken stated that "[n]o evidence of [petitioner's] record was, to my recollection, introduced via the Victim Impact Statement." Exh. 115, at 5. However, Aiken told an investigator for petitioner that the victim impact statement "might have said" that petitioner should not have been let out. Exh. T, at 2.

Aiken asked Michael Scanlon, a Salem police officer, why he had investigated whether the incident involved drugs. Scanlon used his answer to explain the prosecution's theory of the case, replying that "it is not uncommon for people to rob drug dealers simply for the reason that they feel that nobody is going to believe a drug dealer if they make a complaint of robbery.... [T]hrough the investigations and what not, and my familiarity with Mr. Sager, I felt that it was an appropriate question." 1 Tr. at 234.

During his closing argument, the prosecutor admitted that if the jurors did not believe Wieberdink, they had to acquit petitioner. The prosecutor urged jurors to listen to the 911 tape: "play it over and over again, if you wish." 1 Tr. at 265.

During her closing argument, Aiken characterized petitioner as "a drug dealer and a grower of drugs, of marijuana," although there was no evidence that petitioner was a drug dealer. 1 Tr. at 280. Also during closing argument, Aiken inexplicably stated, "I suggest to you that if a shot was fired, it

didn't strike Mr. Wieberdink." *Id.* at 278. Aiken argued that the victim impact statement, which included Wieberdink's claim that he had moved to California because of the robbery, contradicted Wieberdink's testimony that he had been planning to move before the robbery.

On rebuttal, the prosecutor stated, "I want to talk about Mr. Wieberdink and why I believe he told you the truth in this case." 1 Tr. at 292. He concluded, "I suggest to you that justice will only be done in this case if you agree with me that Mr. Wieberdink told you the truth, and that the defendant brutally beat him, took his wallet, and is guilty of Robbery I, in the First Degree, with a Firearm." 1 Tr. at 306.

For their deliberations, the jurors received the victim impact statement and a tape player with a tape of Wieberdink's 911 telephone call. The judge gave no limiting instructions on the relevance of the victim impact statement or the 911 tape.

The jury found petitioner guilty of first degree robbery with a firearm. Two of the twelve jurors voted against the verdict.

### III. Sentencing, Appeal, and Post–Conviction Proceedings

#### A. Sentencing

Petitioner dismissed Aiken after the trial and the court appointed Robert Abel to replace her. On May 22, 1987, petitioner appeared for sentencing with Abel. However, petitioner told the court that he no longer wanted Abel to represent him. He said that Abel

> has not filed the motion for new trial which I asked to file.... The man lied to me yesterday in regards to those, and I feel it would be in my best interest that he be removed as my attorney, and I appointed new counsel that would represent me to the court properly.... [T]his man hasn't put together the motion I asked him to. And two weeks ago I reminded him again, and he still has not come up to see me about that.

2 Tr. 18–19. Abel disputed petitioner's allegations and moved to withdraw as counsel. The court stated:

Mr. Sager, I think we're at, perhaps, a crossroads. And the crossroads is this, I have been in this community for fifteen years practicing law from both sides of the criminal spectrum, and I have been doing this for the last six or seven. Having been here for that long, I think I am somebody whose opinion is perhaps worth something, and my opinion is that Mr. Abel is as able, no pun intended, to represent you as anybody else in this community is regarding these matters. Given that, I see nothing to be gained by substituting any other counsel in this community for him. I could find you nobody more capable than he is of representing you.

So, the crossroads is this, we have reached the point where if you do not wish to have Mr. Abel represent you any longer, given that I can't see any purpose to be served in substituting any other counsel, other than you might get along with him better, that person also probably would disagree with you somewhat on how this ought to be approached, but, given that, and that being the only thing that could be gained, we have two choices here. Either Mr. Abel can continue to represent you, or, if you want to dismiss him, then you are going to be on your own. I am not going to appoint another attorney to represent you because what is going to happen, on the next occasion that we have to come to court, and it is a crucial time, is you are going to disagree with that attorney and you will be asking for another court appointed attorney.

You are entitled to have counsel represent you. The court has done that. The court does not have to allow you to have new counsel each and every time you feel that what that person is suggesting that you ought to do is not what you want to agree with. So, the choice this morning is that. If you want counsel, you have counsel. I have not relieved him of his responsibilities at this point in time. If you want to dismiss Mr. Abel, I don't see any purpose to be served in appointing you another counsel. You have got one, and an adequate one. How do you want to proceed from this point on, as far as counsel is concerned?

MR. SAGER: I will represent myself.

2 Tr. 21–22. The court did not warn petitioner about the dangers of self-representation. Petitioner said that he planned to file motions for a new trial:

THE COURT: All right. A motion for a new trial. Anything else?

MR. SAGER: Whatever I am entitled to. I do not know. I will have to read the law books, I guess, seeing as I don't have an attorney that would come up and talk to me about it, like he was supposed to, I— and like he agreed to, but never did. That is what—it's not the point that the man wasn't capable of representing me, he was not doing what he told me he would.

2 Tr. at 23.

The trial judge set a hearing for two weeks later, June 5, 1987. Petitioner asked whether he could hire his own attorney. The trial judge stated:

You can hire any lawyer you want to to represent you. Only I don't think we have an obligation to continue to provide you with a court appointed one, being that there was one capable and more than adequate to represent you. But you can hire any lawyer you want. I don't have any intention of denying you a right to do that. I'm simply not going to give you another court appointed one. Especially in this situation where you hired one, fired that lawyer, were given a court appointed one, who had disagreed with you, and now, apparently, you are suggesting to me that you have the means to hire another.

2 Tr. at 33–34.

On Friday, June 5, 1987, petitioner appeared pro se for a hearing on his motion for judgment notwithstanding the verdict or new trial. The trial judge denied the motion and set sentencing for the following Monday, June 8, so petitioner could read the presentence report. Petitioner demanded the right to cross-examine the two psychiatrists who had evaluated him so the court could determine whether he was a dangerous offender.

At the June 8 hearing, petitioner told the trial judge that he no longer wanted to cross-examine the psychiatrists. The judge seemed surprised:

THE COURT: Are you sure [that you do not want to cross examine the psychiatrists]? Just Friday afternoon you told me you did.

THE DEFENDANT: No.

THE COURT: This is Monday morning.

THE DEFENDANT: I waive any examination. Sentence me.

THE COURT: You want to be sentenced this morning?

THE DEFENDANT: You bet.

THE COURT: Are you sure of that?

THE DEFENDANT: Yep.

THE COURT: You haven't taken any drugs or controlled substances over the weekend?

THE DEFENDANT: (Shaking head in the negative)

3 Tr. at 3. When the judge asked petitioner whether the presentence report contained any errors, petitioner replied, "It doesn't make any difference.... I wouldn't have anything—there's quite a few but there's nothing I want to say about it." 3 Tr. at 9.

The judge sentenced petitioner to twenty years for first degree robbery with a minimum of eighty-four months' imprisonment. He also sentenced petitioner as a dangerous offender to thirty years, with a fifteen-year minimum, and a mandatory minimum sentence of five years for use of a firearm. He required $1,000 restitution. After imposing the sentence, the judge remarked that petitioner would be "back on the streets ... maybe in a minimum of five years. But my guess is no greater than age 40," which would have been seven years. 3 Tr. at 18. In fact, the sentence required that petitioner serve a minimum of fifteen years in prison.

### B. Appeal

Petitioner was initially represented on appeal by the state public defender. However, the Oregon Court of Appeals granted petitioner's motion to dismiss his counsel and to represent himself. The Court of Appeals affirmed the conviction without opinion, and

the Oregon Supreme Court denied the petition for review. *State v. Sager,* 89 Or.App. 679, 751 P.2d 1129, *review denied,* 305 Or. 577, 753 P.2d 1382 (1988).

### C. Post–Conviction Proceedings

Petitioner sought state post-conviction relief. On July 10, 1990, a Marion County Circuit Court Judge held a brief post-conviction trial without receiving live testimony. On October 11, 1990, the judge sent the parties a letter:

This matter is before the Court on petitioner's request for post-conviction relief. The general theme of his request is inadequacy of counsel, both at the trial and appellate levels. I have reviewed the memoranda and exhibits and file herein. I don't see any reason to go through this issue-by-issue as they are multiple. Suffice it to say that in my opinion, trial counsel did an adequate job, as did appellate counsel, and Mr. Sager's rights were protected at trial and appellate levels. He chose to terminate his counsel at both levels and certainly anything he did representing himself cannot be reflected upon those counsels.

I would ask that the attorney for the defendant prepare the appropriate order.

On December 20, 1990, the court issued findings of fact and conclusions of law, adopting respondent's proposed findings and conclusions verbatim. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied the petition for review. *Sager v. Maass,* 110 Or.App. 371, 821 P.2d 1135 (1991), *review denied,* 313 Or. 74, 828 P.2d 457, *cert. denied,* 506 U.S. 839, 113 S.Ct. 120, 121 L.Ed.2d 76 (1992).

## DISCUSSION

### I. Standard of Review

A federal habeas court generally accepts state court findings of historical fact. 28 U.S.C. § 2254(d). However, the federal court should not accept findings when the state fact-finding procedure was inadequate, the petitioner did not receive a full, fair, and adequate hearing, or the findings are not

"fairly supported by the record." 28 U.S.C. § 2254(d)(2), (6), (8).

■ The federal habeas court reviews de novo state court rulings on mixed questions of fact and law and purely legal questions. *Swan v. Peterson,* 6 F.3d 1373, 1379 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994). Because ineffective assistance of counsel and waiver of the right to counsel are mixed questions, I give de novo review to the state post-conviction court's rulings on those issues. *Tomlin v. Myers,* 30 F.3d 1235, 1237 (9th Cir.1994) (ineffective assistance of counsel is mixed question); *Wells v. Maass,* 28 F.3d 1005, 1011 (9th Cir.1994) ("a federal habeas court reviews de novo a state court's conclusion that a waiver was voluntary or involuntary").

## II. Petitioner Received Ineffective Assistance of Counsel

■ To demonstrate ineffective assistance of counsel, petitioner must show that his attorney's performance fell below an objective standard of reasonableness and that the performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Conduct falls below an objective standard of reasonableness when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* There is a strong presumption that an attorney's conduct falls within "the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

■ " 'To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Rice v. Wood,* 44 F.3d 1396, 1404 (9th Cir.1995) (quoting *Hendricks v. Vasquez,* 974 F.2d 1099, 1109 (9th Cir.1992)). The court should focus on

whether the " 'result of the proceeding was fundamentally unfair or unreliable.' " *United States v. Palomba,* 31 F.3d 1456, 1460–61 (9th Cir.1994) (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993)).

■ Here, petitioner does not need to show a reasonable possibility that he would have been acquitted had he been represented by adequate trial counsel. It is sufficient to show the possibility of a conviction on a lesser charge, such as unarmed robbery. *See Chambers v. Armontrout,* 907 F.2d 825, 832 n. 13 (8th Cir.) (en banc), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

### A. Counsel's Performance Was Deficient

Petitioner asserts that his trial attorney committed more than a dozen prejudicial errors. *See Lockhart,* 506 U.S. at 385, 113 S.Ct. at 851 n. 7 ("An attorney who makes one error of *Strickland* proportions is unlikely to have turned in a performance adequate in all other respects.") (Stevens, J., dissenting). Because I will focus on two errors that establish ineffective assistance of counsel, I need not address petitioner's other claims. *See Rice,* at 1404 n. 10 (district court not required to dispose of every claim for relief raised in habeas petition; declining to adopt *Clisby v. Jones,* 960 F.2d 925, 936 (11th Cir.1992) (en banc)).

#### 1. Victim Impact Statement

■ The trial attorney's most egregious error was introducing Wieberdink's entire victim impact statement into evidence. This blunder alone fatally tainted the trial.

The trial attorney considered the victim impact statement relevant as a handwriting sample and as impeachment evidence.[1] Neither reason justified the introduction of such a prejudicial piece of evidence. The trial attorney could have introduced a sample of Wieberdink's handwriting through an innocu-

---

1. Respondent argues that Aiken introduced the victim impact statement "solely to impeach the victim-witness because the signatures did not match." Memorandum in Support of Motion to Deny Habeas Corpus Relief, at 15. However, Aiken contended that the victim impact statement contradicted Wieberdink's testimony that he was planning to move to California before the incident. Aiken's argument encouraged the jurors not just to compare signatures, but also to read the victim impact statement.

ous document, and she had several more important grounds on which to impeach Wieberdink's testimony. *See United States v. Bosch,* 584 F.2d 1113, 1122 (1st Cir.1978) (ineffective assistance of counsel for defense attorney to introduce bail motion that referred to the defendant's drug convictions). An adequate defense attorney would have realized that the victim impact statement could only prejudice the jury by bolstering Wieberdink's testimony and creating sympathy for him.[2]

■ As the trial judge noted, this case is unusual, perhaps unique, because the accused's own attorney introduced the victim impact evidence. Aiken should have known that evidence of a crime's effect on the victim is generally not admissible during the guilt phase of a trial. *See, e.g., United States v. Copple,* 24 F.3d 535, 545–46 (3d Cir.) (error to admit victims' testimony about fraudulent scheme's harm to their health and savings), *cert. denied,* — U.S. —, 115 S.Ct. 488, 130 L.Ed.2d 400 (1994); *Armstrong v. State,* 826 P.2d 1106, 1116 (Wyo.1992) ("Consideration of victim-impact testimony or argument remains inappropriate during proceedings determining the guilt of an accused."); *Stavinoha v. State,* 808 S.W.2d 76, 78 (Tex.Crim. App.1991); *People v. Hobley,* 159 Ill.2d 272, 202 Ill.Dec. 256, 275, 637 N.E.2d 992, 1011, *cert. denied,* — U.S. —, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994); *cf. Payne v. Tennessee,* 501 U.S. 808, 830 n. 2, 111 S.Ct. 2597, 2611 n. 2, 115 L.Ed.2d 720 (1991) (use of victim impact statements during sentencing phase of capital case did not per se violate Eighth Amendment; Court did not address admissibility of victims' opinions about the crime, the defendant, and the appropriate punishment). Such evidence is admissible only if it is relevant to the accused's guilt and not unduly prejudicial. *See, e.g., Ex parte Crymes,* 630 So.2d 125, 126 (Ala.1993).

### 2. Tape of 911 Call

Aiken failed to make valid objections to the admission of the taped 911 telephone call.

She objected only on authenticity grounds, but not to the tape's references to petitioner as "Nazi Red" and as a person well known to the local police. (References to the Gypsy Joker motorcycle club may have been relevant to explain Wieberdink's animosity toward petitioner. *Cf. United States v. Fagan,* 996 F.2d 1009, 1015 (9th Cir.1993) (brief reference to defendant's gang membership relevant to show why witness recognized defendant).)

The 911 tape was arguably admissible as an excited utterance. *See, e.g., Bemis v. Edwards,* 45 F.3d 1369, 1372–75 (9th Cir. 1995) (describing grounds for admitting 911 tapes); *United States v. Mejia–Velez,* 855 F.Supp. 607, 613–14 (E.D.N.Y.1994); *State v. Wolfs,* 119 Or.App. 262, 265–66, 850 P.2d 1139, *review denied,* 317 Or. 163, 856 P.2d 318 (1993). However, a competent defense attorney would have listened to the tape before it was played to the jury and sought to remove the irrelevant, inflammatory references to petitioner. *Cf., e.g., State v. King,* 604 So.2d 661, 667 (La.App.1992) (*edited* recording of 911 call admissible); *People v. Slaton,* 135 Mich.App. 328, 354 N.W.2d 326, 329–31 (1984) (same).

Respondent argues that the 911 tape was no more prejudicial than Wieberdink's testimony. Wieberdink did refer to petitioner as "Nazi Red" and "Nazi" during his direct testimony, but Aiken should also have objected to those references.

■ More importantly, Wieberdink did not testify that "[t]he police know him in this town real well." Such a statement is irrelevant and unduly prejudicial, implying that petitioner was a habitual criminal. The prosecution cannot introduce evidence of a defendant's "unsavory character merely to show that he is a bad person and thus more likely to have committed the crime." *United States v. Roark,* 924 F.2d 1426, 1434 (8th Cir.1991) (footnote omitted). Jurors are not likely to remain impartial after hearing evi-

---

**2.** The post-conviction court found that "[t]rial counsel did not introduce petitioner's past record through introduction of a victim's impact statement." Exh. 118 at 13. The evidence on this issue is at best inconclusive. In any event, the

state court did not dispute that the victim impact statement contained Wieberdink's description of the robbery's effect on his life, his sentencing recommendation, and his claim for restitution.

dence which "permits them to believe that acquitting the defendant may mean releasing an exceedingly dangerous" person. *United States v. Bland*, 908 F.2d 471, 473 (9th Cir. 1990).

### B. Counsel's Performance Prejudiced Petitioner

The errors committed by petitioner's trial counsel prejudiced his defense. The victim impact statement corroborated Wieberdink's testimony, implied official recognition of his status as a victim, and tended to create sympathy for him. The 911 call injected irrelevant but inflammatory references to petitioner as "Nazi Red" and well known to the police. The trial judge gave no limiting instructions.

The 10–2 verdict shows the weakness of the prosecution's case. The prosecution's chief witness was a drug dealer whose description of the robbery became more dramatic at each retelling. There was no gun or stolen property in evidence. Under these facts, there is a reasonable possibility that the ten jurors who voted to convict were improperly swayed by the prejudicial references to petitioner, believing that he was a bad person likely to commit armed robbery.

### III. Waiver of Counsel at Sentencing Was Invalid

 To invoke the Sixth Amendment right to self-representation, the defendant's request must be "(1) knowing and intelligent, and (2) unequivocal." *Hendricks v. Zenon*, 993 F.2d 664, 669 (9th Cir.1993). "[T]he government ... bears the burden of showing that a defendant's waiver of trial counsel was knowing and intelligent." *United States v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir.1994).

 The judge must discuss in open court "whether the waiver was knowingly and intelligently made, with an understanding of the charges, the possible penalties, and the dangers of self-representation." *Hendricks*, 993 F.2d at 669–70. The government must have " 'proof that the defendant understood his or her constitutional right to have a lawyer perform certain core functions, and that he or she appreciated the possible con-

sequences of mishandling these core functions and the lawyer's superior ability to handle them.' " *United States v. Arlt*, 41 F.3d 516, 520 (9th Cir.1994) (quoting *Mohawk*, 20 F.3d at 1484). The court must focus on what the defendant understood, not on what the court said or understood. *United States v. Van Krieken*, 39 F.3d 227, 229 (9th Cir.1994).

 Here, the trial judge never warned petitioner about the dangers of representing himself. Such a failure requires automatic reversal except in rare cases " 'when the record as whole reveals a knowing and intelligent waiver.' " *Hendricks*, 993 F.2d at 670 (quoting *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir.1987)). The court should not imply such a waiver unless " 'the background and experience of the defendant in legal matters was apparent from the record.' " *Id.* (quoting *United States v. Harris*, 683 F.2d 322, 324 (9th Cir.1982)). "Simply warning a defendant that he may be required to proceed without counsel ... is insufficient." *Id.*

 There is no indication that petitioner had previously represented himself or had any particular expertise in legal matters. It is irrelevant whether a defendant later represented himself capably. *Mohawk*, 20 F.3d at 1485. In fact, petitioner's performance at his sentencing was woefully inadequate. Petitioner's sentence is invalid because his waiver of counsel was not knowing and intelligent.

Petitioner also claims that the Oregon Court of Appeals failed to warn him of the dangers of self-representation. Because of my other rulings, I will not address this claim.

### IV. Other Issues

Petitioner contends that his post-conviction trial was fatally flawed. Because I grant the habeas petition on other grounds, I will not consider the adequacy of the post-conviction trial.

Petitioner requests an evidentiary hearing. No hearing is necessary because the record is sufficient.

## CONCLUSION

Petitioner's petition for habeas relief (# 3) is granted. Petitioner's request for an evidentiary hearing is denied. Respondent must retry petitioner within ninety days or release him.